IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JAMES HOTCHKISS,

    Plaintiff,

v.

    Case No. 3:16-CV-00752-NJR

ALFONSO DAVID, M.D.,

    Defendant.

# MEMORANDUM AND ORDER

    Pending before the Court is a Motion for Summary Judgment by Defendant Alfonso David, M.D. (Doc. 115). For the reasons set forth below, the Court grants the Motion and dismisses this action with prejudice.

    This action stems from events which occurred during Plaintiff James Hotchkiss's ("Hotchkiss") term of incarceration at Shawnee Correctional Facility, a medium-security facility operated by the Illinois Department of Corrections ("IDOC").

### FACTUAL AND PROCEDURAL BACKGROUND

    Hotchkiss entered IDOC custody in 2015. At that time, Hotchkiss already had arthritis in his left knee, narrowing of his left hip joint, and osteoarthritis (Doc. 115-2). As a result of a 1987 car accident, Hotchkiss had undergone knee and hip replacement and his left femur had been repaired by insertion of a metal rod (Doc. 115-1 at 8). Hotchkiss wore regular tennis shoes at the time he entered custody and already suffered from knee, hip, and back pain (*Id.* at 10, 18). Hotchkiss was given standard-issue shoes upon his entry into custody (*Id.* at 14).

Hotchkiss was transferred to Shawnee on March 25, 2015 (Doc. 115-4). On April 8, 2015, he was first seen by David for self-reported left hip pain, and David prescribed Naprosyn for the pain (Doc. 115-3 at 40-46). Through April and May 2015, David claims that Hotchkiss was repeatedly seen by medical personnel including David for reports of pain in his hip, left knee, and femur, and he was repeatedly prescribed Naprosyn or given Ibuprofen for the pain (*Id.* at 56-51).

In July 2015, after Hotchkiss requested a cane and slow walk permit, David examined him, observed a normal gait and ambulation, and deemed a slow walk permit and cane unnecessary (*Id.* at 53). Hotchkiss also requested a low bunk permit on October 4, 2015. Hotchkiss indicates that at this time he stated to a nurse that he had previously worn specially fitted orthotic footwear (Doc. 118 at 2-3). David examined him on October 6, 2015, and found a low bunk permit not to be medically indicated based on his gait and ambulation (*Id.* at 56).

From October 2015 through February 2016, Hotchkiss repeatedly reported pain in his left hip and knee and was repeatedly prescribed a variety of painkillers (Doc. 115-3 at 57-75). On at least one occasion, Hotchkiss was found to have accumulated a large number of pills, indicating that he had not regularly been taking his prescribed medication (*Id.* at 61).

On October 8, 2015, Hotchkiss filed his first grievance, complaining that his boots were causing him discomfort and requesting flat-bottomed shoes (Doc. 115-6). On November 26, 2015, Hotchkiss requested a low gallery and slow walk permit, stating that he was having trouble keeping up with the chow line (*Id.* at 68). He was assessed by a

nurse on December 1, and was found to have a steady gait and walk with adequate speed and good strength in his lower extremities (*Id.* at 69). Hotchkiss was nevertheless granted the low gallery permit, but he was denied the slow walk permit (*Id.*). Hotchkiss was later granted the slow walk permit in February 2016 (*Id.* at 72). On February 6, 2016, Hotchkiss filed a second grievance claiming that he had not been regularly receiving his pain medication and indicating that he had filed at least five grievances already (Doc. 115-7 at 4-5). On March 3, 2016, Hotchkiss wrote a letter to the Director of Nursing at Shawnee, stating that since 1987 he had worn flat-bottomed shoes and speculating that the heels of his prison-issue shoes were causing pain that might be remedied by tennis shoes (Doc. 115-6). Although Hotchkiss often had upwards of $100 in his prison trust fund account, he did not buy tennis shoes, which were available for purchase at the commissary (Doc. 115-7).

In March 2016, Hotchkiss began complaining of pain in his heel, and he was repeatedly seen by health care professionals who prescribed various painkillers (Doc. 115-3 at 76-79). On April 7, 2016, Hotchkiss was seen by Dr. Roderick Matticks for his complaints of foot pain. Matticks measured Hotchkiss's legs and discovered that his left leg was ½ inch shorter than his right leg (*Id.* at 1). Matticks issued a quad cane, a slow walk permit, and a double sock permit (*Id.*). Hotchkiss continued to complain of pain in his left knee and hip in May and June 2016, and his slow walk permit was renewed (*Id.* at 2-6). On July 1, 2016, he was seen by Matticks in regards to his request for orthotic footwear, and Matticks referred his case for collegial review (*Id.* at 7). Collegial review determined that a shoe lift was not medically necessary as the discrepancy in the length

of his legs was only ½ inch, and a ½ inch heel insert was instead an appropriate treatment (Doc. 115-5 at 21).

On August 21, 2016, the Health Care Unit received Hotchkiss's ½ inch insert and gave it to Hotchkiss (Doc. 115-3 at 12). Hotchkiss in his deposition indicated that he placed it in his shoe for part of a day but felt it was useless (Doc. 115-1 at 26-27). Hotchkiss continued to register periodic complaints about pain in his leg from September 2016 through April 2017, and he was prescribed various painkillers (Doc. 115-3 at 15-28). During this period, Hotchkiss was seen by David and stated that he was not wearing the heel insert because he wanted a shoe lift (*Id.* at 27). David again referred his case to collegial review, which again denied the request for a shoe lift as medically unnecessary for a discrepancy of only ½ inch (*Id.* at 33-35).

On April 11, 2017, Hotchkiss was seen by physical therapist Cody Hubble, who prescribed a 30-minute Home Exercise Plan to address pain and flexibility issues arising from Hotchkiss's gait (*Id.* at 37). Hotchkiss consistently refused to perform his daily exercises (*See id.* at 103-163).

On September 9, 2017, Hotchkiss was released from Shawnee. He has stated that he now wears flat-soled shoes and a full-length insert but has not noticed any improvement in his condition (Doc. 115-1 at 31).

### LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED.

R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317,232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence[.]" *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

## DISCUSSION

A.   Applicable Law

To succeed on a claim based on deliberate indifference in the context of medical services, an inmate must demonstrate (1) an objectively serious medical need and (2) that defendants had a subjectively culpable state of mind in acting or failing to act in disregard of that risk. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

A medical need may be deemed serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the

need for a doctor's attention." *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). A medical condition "need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id.* (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

To establish that prison medical staff acted with a subjectively culpable state of mind, an inmate need not show that harm was actually intended, but merely that "defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Id.* (quoting *Greeno*, 414 F.3d at 653). Medical professionals are entitled to deference when acting in their professional capacities, and inmates face a heavy burden when bringing claims of deliberate indifference against them. *Id.* "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)). Merely negligent conduct will not rise to this level—rather, such conduct must reach a level "showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821-822 (7th Cir. 2012) (quoting *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006)).

B.   *Discussion*

Here, Hotchkiss has failed to present evidence supporting his claim that special orthotic footwear was a serious medical need or that David was deliberately indifferent.

First, Hotchkiss was examined multiple times by medical professionals who consistently found that for a discrepancy of leg length of only ½ inch, orthotic footwear was not necessary, and heel inserts were the appropriate treatment. Hotchkiss indicates that he now has the footwear that he so long insisted was necessary, yet he has not seen any improvement in his condition. There is simply no colorable argument in support of Hotchkiss's contention that special footwear was necessary other than his own inexpert opinion.

As for deliberate indifference, the record shows that numerous medical personnel devoted a significant amount of time to treating Hotchkiss, seeing him numerous times and prescribing a range of treatments, including many types of painkillers, heel lifts, and physical therapy. Hotchkiss appears to have been unwilling to participate in much of this treatment, having taken his medication irregularly, refused to wear his heel lift, and rejected physical therapy. Hotchkiss was additionally given special permissions for a low bunk, slow walking, and double socks. David's treatment of Hotchkiss in particular shows no signs of deliberate indifference—even if Hotchkiss is accurate in alleging that he stated to a nurse that he had previously worn orthotic footwear, this does not support a finding of deliberate indifference against David, as there is no indication that David was aware of this remark. Furthermore, even if he had been aware of previous treatment, he would be justified in conducting his own examination and reaching his own conclusions as to what course of treatment was medically justified, as he appears to have done.

While Hotchkiss's claim against David is premised largely on alleged delay in treatment, this does not appear to accurately represent Hotchkiss's issues with the medical treatment that he received. There does not appear to have been delay in receiving treatment—Hotchkiss was seen regularly and promptly. While there was some delay in granting his request for a cane, the initial denial was based on a medical assessment of his gait, and there is no indication that David's initial conclusion was unjustified. Hotchkiss's main issue is that he was not given orthotic shoes, yet here the Shawnee medical staff did not give him delayed treatment—rather, they examined him repeatedly and concluded that the requested treatment was not warranted. Hotchkiss has presented no evidence to oppose this conclusion apart from his own opinion.

In short, taking the evidence in the light most favorable to Hotchkiss, no reasonable jury could find his allegations plausible, and the Court must dismiss this action.

## CONCLUSION

The Court **GRANTS** David's Motion for Summary Judgment (Doc. 115) and **DISMISSES** this action **with prejudice**. The Court **DIRECTS** the Clerk of Court to close this case and enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:  April 2, 2021**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**