IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CHARLES KUCINSKY,

                    Plaintiff,

v.                                                    Case No. 3:20-CV-00617-NJR

FAIYAZ AHMED,

                    Defendant.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Charles Kucinsky, an inmate in the Illinois Department of Corrections, suddenly experienced extreme pain in his right leg in late May 2018, while standing in the yard at Lawrence Correctional Center ("Lawrence").[1] (Docs. 1, pp. 33, 35; 87-1, p. 43). The pain persisted and, after Kucinsky filed a grievance, a nurse examined him in the segregation interview room on June 5, 2018.[2] (Docs. 1, p. 33; 87-3, p. 10). The nurse evaluated Kucinsky for a bite to his right ankle and noted visible irritation to the area. (Doc. 87-3, p. 10). Specifically, Kucinsky's ankle was red, swollen, and hot to the touch with a hard area. (*Id.*). Kucinsky suspected that he may have been bitten, but he could not identify any source. (*Id.*). Based on these observations, the nurse referred Kucinsky to the health care unit for an evaluation by a physician. (*Id.*).

---

[1] Kucinsky is currently incarcerated at Shawnee Correctional Center. *See* https://idoc.illinois.gov/offender/inmatesearch.html (last visited Sept. 5, 2024).

[2] Kucinsky testified that he was in segregation at Lawrence when the events surrounding this lawsuit occurred. (Doc. 87-1, pp. 10-14). He was housed in segregation for a continuous period from 2012 to December 2021. (*Id.*). During segregation, he spent most of his time restricted to his cell. (*Id.*). While in segregation, he estimates that on average he occupied his cell for 22 hours or more per day. (*Id.* at p. 13).

Within an hour, Defendant Dr. Faiyaz Ahmed saw Kucinsky. (*Id.* at p. 9). Dr. Ahmed charted complaints of ongoing pain in the right distal fibula[3] for 10 days. (*Id.*; Doc. 87-2, pp. 48-52, 108-22). The outpatient progress note reflects that Kucinsky reported he was running at the onset of the injury, but Kucinsky testified that he did not recall whether that was accurate. (Docs. 87-1, pp. 43-44; 87-3, p. 9). Dr. Ahmed observed tenderness and soft tissue swelling in the right distal fibula region with no erythema (redness).[4] (Docs. 87-2, pp. 110-11; 87-3, p. 9). Given Kucinsky's complaints and the physical observations, Dr. Ahmed diagnosed Kucinsky with a contusion[5] or an insect bite on his right ankle. (Docs. 87-2, pp. 218-19; 87-3, p. 9). To further assess the injury, Dr. Ahmed ordered an x-ray of the right distal fibular region and directed that Kucinsky return to the clinic in two weeks. (Doc. 87-2, pp. 124, 222; 87-3, p. 9).

During his deposition, Kucinsky's counsel pressed Dr. Ahmed about the recorded diagnosis of a contusion or bug bite. (Doc. 87-2, pp. 98-106). Dr. Ahmed reiterated that, at this initial visit, the injury appeared to be a bruise or an insect bite. (*Id.*). When asked if hotness to the touch indicated a displaced fracture, Dr. Ahmed testified, "No…usually there is no hot…so it's a little bit atypical." (*Id.* at p. 105). Dr. Ahmed thought the hotness indicated a bruise or insect bite that became infected. (*Id.*). He repeatedly testified that Kucinsky's symptoms were atypical for a fracture, especially considering Kucinsky's

---

[3] The distal fibula is the lower end of the fibula, or non-weightbearing calf bone that supports muscles, tendons, and ligaments, that forms the top of the ankle joint. *Fibula (Calf Bone),* CLEVELAND CLINIC (Aug. 20, 2024, 10:45 AM), https://my.clevelandclinic.org/health/body/23122-fibula-calf-bone.

[4] *See Erythema,* STEDMAN'S MEDICAL DICTIONARY, 302460, Westlaw (database updated Nov. 2014).

[5] During his deposition, Dr. Ahmed did not provide a clear definition of "contusion." At one point he explained that, "[c]ontusion means bruise," but later stated that contusions and bruises are different because "bruising has little bit skin abrasion and red," and a "[c]ontusion is less than an abrasion." (Doc. 87-2, pp. 130-31).

reported history of the injury. (*Id.* at pp. 86-87, 105-06, 126). He stated, "I didn't [think] it was a fracture. I thought it was a bruise, you know, and—or according to this some insect [bite], but I thought let's get the X-ray done to[o]." But Dr. Ahmed acknowledged the possibility of a fracture and admitted that, "we suspected that might be a fracture, so we—I X-rayed." (*Id.* at pp. 99-106, 121-26). According to Dr. Ahmed, he ordered an x-ray to rule out the possibility of a fracture. (*Id.* at pp. 116, 121).

Kucinsky stated that he requested pain medication and a low gallery permit, but Dr. Ahmed refused both requests. (Doc. 87-1, pp. 60-61). Dr. Ahmed testified that he chose not to prescribe pain medication because he "was not sure there was a fracture and [Kucinsky] didn't ask for the pain medicine." (Doc. 87-2, p. 141). Further, Dr. Ahmed stated that Kucinsky's "blood pressure [was] not high, pulse was not high,…and…[he]…didn't show any acute distress." (*Id.* at pp. 141-42). He also presumed Kucinsky could get any necessary pain medication from the nurses without a doctor's order. (*Id.* at pp. 46-47, 58, 117, 120, 137, 146).

Two days after the initial visit, on June 7, 2018, Kucinsky received an x-ray of his right tibia and fibula as ordered. (Doc. 87-3, p. 11). That same day, Dr. Ahmed reviewed the x-ray and met with Kucinsky. (*Id.* at p. 13). From the x-ray, Dr. Ahmed perceived a nondisplaced[6] fracture of the right distal fibula. (*Id.*). During this follow-up appointment, Dr. Ahmed also observed the same swelling and tenderness that he had seen before. (*Id.*).

---

[6] Dr. Ahmed used the term "undisplaced" fracture. For consistency, the Court proceeds with the term nondisplaced to describe a fracture type that is not displaced. The bones are not out of place or alignment with a nondisplaced fracture. Whereas, with a displaced fracture, the broken bone fragments separate. *Ankle Fractures (Broken Ankle)*, ORTHOINFO FROM THE AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS (Aug. 20, 2024, 4:00 PM) https://orthoinfo.aaos.org/en/diseases--conditions/ankle-fractures-broken-ankle/.

To treat the nondisplaced fracture, Dr. Ahmed ordered Ibuprofen (600 milligrams) for six weeks,[7] an orthopedic referral, an Ace bandage, and continued use of crutches. (*Id.*; Doc. 87-2, pp. 145-46; 87-5, p. 8; 87-7, pp. 5-6). When asked why he ordered an Ace bandage instead of a walking boot, Dr. Ahmed testified that Lawrence's health care unit was not equipped with walking boots. (Doc. 87-2, pp. 148-51). Dr. Ahmed also explained that an Ace bandage and crutches function the same as a boot to stabilize the leg and reduce weightbearing on the ankle. (*Id.* at pp. 149-53).

Interestingly, an independent radiologist reviewed the x-ray and assessed no acute bony fracture or bony erosive change and noticed mild osteoarthritis of the knee joint and ankle joint. (Doc. 87-5, p. 32). Dr. Ahmed received this report on June 12, after meeting with Kucinsky. (*Id.*; Doc. 87-3, pp. 227, 231). Nonetheless, Dr. Ahmed did not change his interpretation or the previously set treatment plan. (Doc. 87-3, p. 13).

The medical records do not convey that Dr. Ahmed explicitly instructed Kucinsky to stay off his ankle at the appointment on June 7. (*See* Doc. 87-3, p. 13). When asked about this by Kucinsky's counsel, Dr. Ahmed stated that "the crutches keep you off," and further explained that the physical therapists hold responsibility for adjusting the crutches, giving instructions, and teaching how to use them. (Doc. 87-2, pp. 159-60). As to the low gallery permit, Dr. Ahmed vacillated between several explanations for not issuing one including,

---

[7] As to the pain medication, Kucinsky asserts that Dr. Ahmed's prescription was actually for 400 milligrams of Motrin (a brand name for Ibuprofen). (Doc. 90, p. 41). While the notes from the June 7 visit indicate an intention to prescribe 600 milligrams, the prescription order does show that Dr. Ahmed ordered 400 milligrams of Motrin for six weeks. (Doc. 87-3, p. 13; 87-7, pp. 5-6, 31).

"I don't remember," "[Kucinsky] didn't ask me," and "I thought he was already on a low gallery." (*Id.* at p. 162).

While crutches were delivered to his cell, Kucinsky claims that he never received the Ace bandage. (Doc. 87-1, pp. 66-67). Kucinsky also states that he did not receive pain medication for weeks following his second appointment with Dr. Ahmed.[8] (*Id.* at p. 69). Having not received pain medication, Kucinsky complained to a nurse practitioner on June 21 at a follow-up appointment. (Doc. 87-3, p. 17). He recalls that he received pain medication later that day. (Doc. 87-1, p. 77). Kucinsky's counsel questioned Dr. Ahmed about this delay. (Doc. 87-2, pp. 162-64). Dr. Ahmed explained his role in the process as prescribing medication and, after that, the nurses physically distribute medication to patients. (*Id.*). Dr. Ahmed testified that he was unaware that Kucinsky had not received the prescribed pain medicine. (*Id.*). After the June 21 appointment, the nurse practitioner also did not provide a low gallery permit to Kucinsky. (*See* Doc. 87-3, p. 17).

Meanwhile, Dr. Ahmed's referral to an orthopedic specialist was submitted and approved through the collegial review process. (Doc. 87-5, pp. 8-9, 11-12). Throughout June, a prison medical records clerk charted several notes related to scheduling the outside referral. (Doc. 87-3, pp. 14-16, 18). The day after the x-ray and second appointment with Dr. Ahmed, the records office called Carle Orthopedics to schedule a consult, faxed necessary information, and planned to wait for a return call. (*Id.* at p. 14). Five days later, a

---

[8] A note on Dr. Ahmed's prescription order indicates "#30 issued." (Doc. 87-7, p. 31). But the pharmacy's medication administration record is not clear as to when the Motrin was actually provided to Kucinsky. (*See id.* at pp. 5-7). For example, Dr. Ahmed's prescription is dated June 7, 2018, and the medication administration chart has a checkmark for June 6, 2018, as a distribution date. (*Id.* at p. 5).

records office note indicates that the office would mail the x-ray films to Carle Orthopedics once returned by the radiologist, which were needed for review before scheduling an appointment. (*Id.*). A week later, the films were mailed to the orthopedic office. (*Id.* at pp. 15, 16). On June 25, four days after the films were sent, the medical records office scheduled a consult with a Dr. Low at Carle Orthopedics for June 28 at 9:00 a.m. (*Id.* at p. 18).

Dr. Low determined that Kucinsky's right distal fibula fracture was healing and his x-rays "look[ed] good." (Doc. 87-5, p. 11). Noting that Kucinsky's pain was controlled,[9] Dr. Low elected not to alter the pain management plan. (*Id.*). Dr. Low provided Kucinsky a boot (which was charted as optional) and advised that Kucinsky could walk and remove the boot for hygiene, stretching exercise, and as comfort allowed. (*Id.*). Kucinsky was warned against running, jumping, or engaging in impact exercises. (*Id.*). Dr. Low recommended a follow-up appointment in one month, which was submitted by Dr. Ahmed to collegial review and ultimately approved. (*Id.* at pp. 11-15, 22). On the same day as his visit with Dr. Low, Kucinsky saw Dr. Ahmed for the last time. (Doc. 87-3, p. 20). Dr. Ahmed reviewed Dr. Low's plan, ordered a permit for a boot, submitted a request for the orthopedic follow-up visit, reviewed the instructions with Kucinsky, and ordered Kucinsky to return to the clinic in two weeks. (*Id.*; 87-5, p. 12; 87-6, p. 5).

Kucinsky met with a nurse practitioner for his two-week follow-up appointment with the clinic. (Doc. 87-3, p. 21). He reported he was doing well with the boot but still

---

[9] Dr. Low also wrote that either "Motrin" or "motion" was well-tolerated, but the handwriting is unclear. (*See* Docs. 87-3, p. 20; 87-5, pp. 11, 14).

needed Ibuprofen for the pain. The nurse practitioner prescribed more 400 milligram Ibuprofen for six months and provided Kucinsky with a low gallery permit. (*Id.*; 87-6, p. 6). Two weeks later, the medical records office scheduled a follow-up appointment with Dr. Low on August 14, 2018. (Doc. 87-3, p. 22). Dr. Low met with Kucinsky as scheduled and found that his right ankle fracture was healing well and that his pain was controlled. (Doc. 87-5, p. 13). Dr. Low instructed Kucinsky to engage in weight bearing activity as tolerated. (*Id.*). Based on the healing progress, Dr. Low recommended no restrictions and no further follow up. (*Id.*). After his last visit with Dr. Low, a nurse practitioner evaluated Kucinsky on August 16. (Doc. 87-3, p. 25). She recorded that Kucinsky had been exercising and that no swelling was present in his ankle. (*Id.*). She assessed his fracture as healed and ordered physical therapy but scheduled no additional follow up. (*Id.*).

Two years after this incident, in June 2020, Kucinsky filed this lawsuit. (Doc. 1). Raising claims under 42 U.S.C. § 1983, Kucinsky alleges that he received constitutionally deficient medical care for his nondisplaced ankle fracture and accompanying pain. (*Id.*). Specifically, he alleges that Dr. Ahmed was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. (*Id.*). Dr. Ahmed moved for summary judgment. (Doc. 86). Kucinsky filed a response in opposition (Doc. 90),[10] to which Dr. Ahmed filed a reply (Doc. 91).

## LEGAL STANDARD

Summary judgment is proper only if the moving party can demonstrate, through

---

[10] Kucinsky's complaint was filed *pro se* but the Court recruited counsel to represent him in August 2022 (*see* Doc. 74); counsel filed the response to the summary judgment motion.

pleadings, depositions, answers to interrogatories, and admissions on file, together with

any affidavits, that there is no genuine issue as to any material fact and the movant is

entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422

F.3d 603, 607 (7th Cir. 2005). "A genuine dispute over a material fact exists if 'the evidence

is such that a reasonable jury could return a verdict' for the nonmovant." *Machicote v.*

*Roethlisberger*, 969 F.3d 822, 827 (7th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986)). A fact is material if it might affect the outcome of a suit under the

relevant substantive law. *Ruffin-Thompkins*, 422 F.3d at 607.

To determine if a genuine issue of fact exists, the Court must view the evidence

and draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar*

*Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson*, 477 U.S. at 255. But "[i]nferences

that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713,

719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (internal

citation omitted).

The moving party bears the burden of establishing that no material facts are in

genuine dispute; any doubt as to the existence of a genuine issue must be resolved against

the moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160-61 (1970); *see also Lawrence*

*v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004). Once the moving party sets forth the

basis for summary judgment, the burden then shifts to the nonmoving party who must

go beyond mere allegations and offer specific facts showing that there is a genuine issue

of fact for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp.*, 477 U.S. at 322-24. A moving party is entitled to judgment as a matter of law where the nonmoving party "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. The party opposing summary judgment must offer admissible evidence in support of his version of events; hearsay evidence does not create a genuine issue of material fact and cannot be considered on summary judgment. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *see also Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023).[11]

## DISCUSSION

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Prison officials, including physicians or medical staff, violate the Eighth Amendment only when two requirements are met— (1) the alleged deprivation is objectively, sufficiently serious, and (2) the prison official had a sufficiently culpable state of mind. *Thomas v. Martija*, 991 F.3d 763, 768 (7th Cir. 2021)

---

[11] In reference to Dr. Ahmed's list of Undisputed Material Facts, Kucinsky argues that the notes recorded in the medical records in this case are inadmissible hearsay evidence. He cites to case law that suggests Federal Rule of Evidence 803(4) does not provide a hearsay exception for statements by the person providing medical attention to the patient. That may be true, but medical records can also qualify under the exception to hearsay for records of a regularly conducted activity in Rule 803(6). *See Hughes v. Joliet Correctional Center*, 931 F.2d 425, 428 (7th Cir. 1991) ("The medical records are admissible in evidence and therefore appropriately considered in a summary judgment proceeding." (citing Federal Rules of Evidence 803(4) and 803(6)); *see also Cook v. Hoppin*, 783 F. 2d 684, 689-90 (7th Cir. 1986); *see also Boyce v. Wexford Health Sources, Inc.*, No. 15 C 7580, 2017 WL 1436963, at *3 (N.D. Ill. Apr. 24, 2017) ("Medical records are readily authenticated; they are, moreover, exceptions to the hearsay rule and generally admissible at trial." (internal quotation marks omitted)).

(citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The requisite state of mind is deliberate indifference. *Id.*

For the first element, a medical condition is objectively serious if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1022-23 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); accord *Farmer*, 511 U.S. at 836 (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm" (internal quotation omitted) (emphasis added)).

As to the second element, a prisoner plaintiff must show that a prison official had subjective knowledge of—and then disregarded—an excessive risk to the prisoner's health. *Gayton,* 593 F.3d at 620. The plaintiff need not show the defendant "literally ignored" his complaint, but that the defendant knew of the condition and either intentionally or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). Deliberate indifference involves intentional or reckless conduct, not mere medical negligence or malpractice. *Pyles*, 771 F.3d at 409; *see also Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"— not to demand specific care or receive the best care possible. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

Assessing the second element is more challenging in cases concerning inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016) (alterations in original)). "[T]he Eighth Amendment does not reach disputes concerning the exercise of a professional's medical judgment, such as disagreement over whether one course of treatment is preferable to another." *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017). For deliberate indifference, a medical provider's treatment decision must radically depart from accepted professional judgment, practice, or standards such that a jury could reasonably infer that the decision was not actually based on professional judgment. *Whiting*, 839 F.3d at 663. In other words, treatment that is so blatantly inappropriate as to be divorced from any medical judgment can lead to a finding of deliberate indifference. *Anderson v. Randle*, 451 F. App'x 570, 572 (7th Cir. 2011).

Here, as to the first element of Kucinsky's deliberate indifference claim, Dr. Ahmed does not dispute that Kucinsky's injury qualified as a serious medical need. Kucinsky suffered a nondisplaced fracture to his right distal fibula accompanied by pain. As such, the Court will not waste time discussing whether Kucinsky suffered from a serious medical condition. Dr. Ahmed himself diagnosed Kucinsky with a nondisplaced ankle fracture, and

the injury required treatment.[12] The Court finds that Kucinsky experienced a serious medical condition and satisfies the objective element of his claim.

The remaining issue concerns whether Dr. Ahmed acted with the requisite mental state of deliberate indifference in treating Kucinsky's nondisplaced ankle fracture and pain.

Dr. Ahmed primarily argues that in his three visits with Kucinsky he took appropriate steps to treat and address Kucinsky's complaints, including ordering an x-ray, prescribing medication and treatment, and referring Kucinsky to an outside orthopedic specialist for further evaluation. He also followed the instructions of the orthopedic specialist after Kucinsky visited him. As for any delays or disruptions in Kucinsky's treatment, Dr. Ahmed claims that he lacked knowledge of any issues that would have necessitated his intervention or lacked control of the process that caused any such interruption. As such, Dr. Ahmed reasons that summary judgment is appropriate because no genuine issue of material fact exists, and the record demonstrates that he did not act with deliberate indifference to Kucinsky's serious medical need.

In opposition to Dr. Ahmed's motion, Kucinsky argues that Dr. Ahmed acted with deliberate indifference. Kucinsky claims that Dr. Ahmed suspected a fracture at their first appointment on June 5 but failed to provide treatment for that potential fracture for two days. Kucinsky further submits that Dr. Ahmed provided treatment below the standard of care after his June 7 appointment by falling short in his treatment instructions to Kucinsky, refusing to provide a low gallery permit, prescribing a lower dose of pain medication than

---

[12] Even though a radiologist reviewed Kucinsky's x-ray and diagnosed arthritis and not a fracture, the orthopedic specialist seemed to agree with Dr. Ahmed's diagnosis of a nondisplaced fracture and treated Kucinsky's injury as such.

medically necessary, failing to intervene despite knowledge that Kucinsky had not received any pain medication, and not providing a sufficient splint. Kucinsky also claims that the record supports an inference that Dr. Ahmed made decisions based on administrative or business concerns rather than medical judgment. Ultimately, Kucinsky asserts that summary judgment should be denied because there are many genuine issues of material fact that a jury must resolve.

The record establishes that Dr. Ahmed met with Kucinsky three times in June 2018. At the initial appointment on June 5, Dr. Ahmed considered Kucinsky's injury to be an insect bite or a contusion, based on Kucinsky's reported history and the observable symptoms. The medical records confirm this original assessment. But Dr. Ahmed also suspected that Kucinsky's symptoms may be consistent with a fracture, so he ordered an x-ray—which was performed two days later—to rule out that possibility. Kucinsky makes much of the fact that Dr. Ahmed suspected but did not treat a possible fracture at this appointment. He claims that Dr. Ahmed should have provided treatment for a potential fracture at this first appointment (i.e., providing pain/anti-inflammatory medication, crutches, a splint, low gallery permit, referral to an orthopedic specialist, etc.). Instead, according to Kucinsky, Dr. Ahmed did not provide any treatment for a potential fracture despite his suspicion. This is simply not true. Ordering an x-ray *is* an affirmative step in the course of treatment. It is also a crucial part of the diagnostic process that may lead to further treatment or a different diagnosis. Again, Dr. Ahmed ordered an x-ray at the first appointment.

This is quite different from a case where a medical provider suspects an injury but

declines to investigate or creates an unreasonable delay in doing so. *Farmer,* 511 U.S. at 843 n. 8 (a prison official cannot "escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist"); *see also Conley v. Birch*, 796 F.3d 742, 748 (7th Cir. 2015) (based on the evidence "a reasonable jury could conclude that, in refusing either to promptly evaluate [plaintiff's] condition (by ordering an x-ray or performing an in-person exam) or to provide appropriate precautionary treatment (by immobilizing his hand), [defendant] acted with deliberate indifference to [plaintiff's] serious medical needs."). It is also different from a case where a medical provider ordered an x-ray, identified a condition, and after viewing the x-ray chose to do nothing. *See, e.g., Echols v. Craig*, 855 F.3d 807, 812 (7th Cir. 2017) (finding plaintiff easily stated a plausible claim of deliberate indifference when he alleged that the medical provider "knew he broke a drill bit during the [tooth] extraction, ... sutured his gum without accounting for the broken pieces, ... [and] obtained an X-ray that confirmed its presence but did nothing to address the problem.").

Dr. Ahmed testified that he suspected a fracture during the first visit on June 5, which is why he ordered the x-ray. Kucinsky relies on *Conley v. Birch* as support for the proposition that this suspicion triggered the need for immediate treatment of the possible fracture, which Dr. Ahmed failed to provide. In *Conley*, the plaintiff fractured his hand, and years later, he continued to suffer from chronic pain and limited mobility in his hand. *Conley*, 796 F.3d at 744-45. In that case, the *medical records* explicitly stated "possible/probable fracture," a nurse placed an urgent call to the defendant doctor on

Christmas Eve explaining the injury and seeking treatment, and the defendant doctor only prescribed ice and Ibuprofen due to the holidays. *Id.* at 747. The defendant doctor also waited five days to order an x-ray, despite the suspected fracture, and did not recommend immobilization in the meantime. *Id.* at 745-48. Moreover, due to known and foreseeable scheduling practices, the x-ray was also not slated to occur until eight days after it was ordered. *Id.* As such, the *Conley* Court determined that a reasonable jury could find deliberate indifference based on evidence of the defendant doctor's failure to order an x-ray for five days "because of the holidays" when medical personnel "strongly suspected" a fracture. *Id.* at 747-48.

In contrast, Kucinsky's medical records do not indicate that anyone assessed a probable fracture. Unlike the situation in *Conley*, the nurse who met with Kucinsky before Dr. Ahmed on June 5 also assessed the injury as an insect bite and did not flag a possible fracture or even identify an emergent situation. Different from the defendant doctor in *Conley*, Dr. Ahmed immediately ordered an x-ray of Kucinsky's fibula despite his assessment that the injury was likely a bug bite or contusion, and Kucinsky received an x-ray two days later. Dr. Ahmed investigated his suspicion through further testing to verify the proper diagnosis of Kucinsky's injury.

To the extent that Kucinsky argues that Dr. Ahmed acted deliberately indifferent by causing a two-day delay in treatment, the Court disagrees. "A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)).

Whether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing treatment. *Id.*

First, there is no evidence in the record that the two-day delay in treatment exacerbated the nondisplaced fracture. This is unlike a case where the injury was exacerbated due to a medical provider's inaction. *See Petties*, 836 F.3d at 726-27 (defendant failed to provide a splint to a patient with a ruptured Achilles tendon for six weeks, and an orthopedic specialist later noted that the lack of any sort of cast potentially created gapping at the tendon rupture site).

Kucinsky further argues that, by his first meeting with Dr. Ahmed on June 5, he was without pain medication for 10 days despite having a fractured fibula. But even if the Court accepts that Kucinsky injured his leg 10 days earlier, Dr. Ahmed cannot reasonably be blamed for a lack of pain medication at that time as he did not see Kucinsky until June 5. At the June 5 visit, though he had not ruled out a fracture, Dr. Ahmed assessed a bug bite or a contusion. Moreover, even if Kucinsky told Dr. Ahmed that he was in pain, Dr. Ahmed is not obligated to prescribe medication for every subjective complaint of pain he receives—especially when he observed no objective measures of acute distress, and the injury he assessed (bug bite or contusion) would likely not require a higher dose of Ibuprofen than Kucinsky had access to through the sick call nurses.

The record is clear that Dr. Ahmed prescribed pain medication immediately when he discovered the fracture, just two days after the initial appointment. "Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes v. DeTella*, 95 F.3d

586, 592 (7th Cir. 1996). Moreover, Dr. Ahmed's decision not to prescribe pain medication in the first visit, but to prescribe pain medication in the second visit when equipped with more information, is a treatment decision. To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Collignon v. Milwaukee County*, 163 F.3d 982, 987-88 (7th Cir. 1998). Kucinsky offers no evidence to suggest such a departure in this case.

Kucinsky cites three Seventh Circuit cases to support his position that a two-day delay can establish a constitutional violation by causing needless suffering. These cases present much more extreme examples than Kucinsky's situation. In the cited cases, there are two common themes: (1) visible signs of injury and open wounds that went untreated, and (2) prison guards delaying medical attention at the onset of an injury. *See Grieveson v. Anderson*, 538 F.3d 763, 778-80 (7th Cir. 2008) (sufficient evidence of unnecessary delay where defendant guards provided no opportunity for medical attention for two days after plaintiff suffered an assault, had a broken nose, and later required nasal surgery); *see Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (complaint survived dismissal with allegations that, due to New Year's Eve plans, doctor waited two days to treat a fractured and dislocated finger bone sticking through the skin); *see Cooper v. Casey,* 97 F.3d 914, 916-17 (7th Cir. 1996) (defendant guards beat up plaintiffs then refused to provide medical assistance despite plaintiffs' cries in pain from their cells for almost two days). These cases are readily distinguishable from Kucinsky's.

Moving on to the care provided after June 5, the Court notes that Dr. Ahmed reviewed Kucinsky's x-ray results on June 7 (the day of the x-ray) instead of waiting for the outside radiologist's report. Dr. Ahmed met with Kucinsky after his x-ray, diagnosed a nondisplaced fracture of his right distal fibula, and took additional steps to treat the newly confirmed injury. Namely, Dr. Ahmed planned to order 600 milligrams of Ibuprofen, an orthopedic referral, an Ace bandage, and continued use of crutches.

Kucinsky challenges the efficacy of this treatment plan and the adequacy of the care he actually received following the June 7 appointment. Specifically, Kucinsky asserts that Dr. Ahmed was deliberately indifferent because he: (1) actually prescribed pain medication that he knew was ineffective—400 milligrams of Motrin as opposed to 600 milligrams; (2) knew Kucinsky was not receiving the pain medication and did nothing; (3) deviated from his articulated standard of care; (4) provided an ineffective splint; and (5) made decisions based on administrative and business concerns rather than medical judgment.

First, the Court hesitates to even address Kucinsky's argument that a prescription for 400 milligrams of Motrin, as opposed to 600 milligrams, forms the basis of a deliberate indifference claim. A physician's job would be nearly impossible if the line between constitutional and unconstitutional care was 200 milligrams of over-the-counter pain medication. The medical records from the June 7 visit indicate that Dr. Ahmed intended to prescribe 600 milligrams of Ibuprofen to alleviate Kucinsky's pain and inflammation. Dr. Ahmed testified that, while Kucinsky did not complain about pain, he prescribed Ibuprofen in a little higher dose than nurses typically provide for a six-week period because

of the fracture. His prescription order and the medication administration record indicate that he only prescribed 400 milligrams of Motrin (the brand name for Ibuprofen).

At most, the record indicates negligence or a mistake, not deliberate indifference. Of course, it is not enough that a doctor makes a mistake or slips up. *See Petties*, 836 F.3d at 728 (There must be evidence "that a doctor did not just slip up, but was aware of, and disregarded, a substantial risk of harm"). And, even if there is an appreciable disparity between 400 and 600 milligrams of Motrin (which the Court finds highly unlikely), the Eighth Amendment does not guarantee complete pain relief or recovery, just the absence of reckless care. *Armstead v. Marandet,* No. 20-2891, 2021 WL 5492983, at * 2 (7th Cir. Nov. 23, 2021) (citing *Snipes,* 95 F.3d at 592). This is not a situation, as Kucinsky suggests, where Dr. Ahmed persisted in a course of treatment he knew to be ineffective, because there is no indication in the medical records or in the deposition testimony that 600 milligrams of Ibuprofen was necessary to treat Kucinsky's injury or pain or that 400 milligrams would not suffice. In fact, a week after he received the 400 milligrams of Motrin, Kucinsky saw an orthopedic specialist who did not adjust the dosage of pain medication and recorded that Kucinsky's pain was "controlled." The medical records simply reflect that Dr. Ahmed prescribed a lower dose than he initially intended.

Next, Kucinsky argues that Dr. Ahmed knew that Kucinsky was not receiving his pain medication and did nothing about it. There is some dispute about when Kucinsky received his pain medication. Some records indicate that he received pain medication earlier in June, but Kucinsky complained to a nurse practitioner on June 21 that he had not received his prescribed Motrin. It is undisputed that the nurse practitioner issued a new

prescription, and Kucinsky received Motrin that same day. So, at the latest, Kucinsky received his medication on June 21—two weeks after it was prescribed. But there is no evidence in the record indicating that Dr. Ahmed caused or even knew of this delay in delivering the pain medication. Kucinsky's argument mainly hinges on a very protracted portion of Dr. Ahmed's deposition testimony where he said he "always" reviews a patient's Medication Administration Records when treating them. This argument fails. Even if it was Dr. Ahmed's practice to review these records while treating a patient, he was not actively treating Kucinsky after the June 7 appointment until he saw Kucinsky again on June 28. As such, he had no reason to review his Medication Administration Records before June 28. If he did review the records on June 28, Dr. Ahmed would have observed that the nurse practitioner ordered a new prescription on June 21, and Kucinsky received that prescription.

Aside from this vague and convoluted testimony—that does not create an issue of material fact—there is no evidence that Dr. Ahmed was aware or should have been aware that Kucinsky had not received his pain medication for two weeks. If he was not aware of the problem, he had no responsibility to intervene. Moreover, his role was to prescribe the medication. Dr. Ahmed prescribed the pain medication immediately on June 7. After that, the pharmacy and nurses fill prescriptions and deliver medications. Thus, Dr. Ahmed had no personal involvement in delaying the delivery of the pain medication. As the Seventh Circuit has emphasized, "§ 1983 requires personal responsibility—a plaintiff must show the defendant knew about the conduct and facilitated it, approved it, condoned it, or turned a blind eye." *Faulkner v. Fenoglio,* 628 F. App'x 451, 454 (7th Cir. 2016). There is no

evidence in the record that Dr. Ahmed was made aware that Kucinsky had not received pain medication and disregarded that information.

Furthermore, Kucinsky argues that Dr. Ahmed provided inadequate care based on his failure to instruct Kucinsky to rest and elevate his foot, failure to provide a low gallery permit, and failure to provide a sufficient split. In this argument, Kucinsky attempts to manufacture a "standard of care" by cherry-picking from Dr. Ahmed's deposition. Dr. Ahmed testified to numerous approaches to treat a nondisplaced fracture, including compression (Ace bandage), non-weightbearing (rest, crutches, boot, low-gallery permit), stabilization (splint), and anti-inflammatory medicine (Motrin). Dr. Ahmed expressed that his approach of continuing crutches, using an Ace bandage, taking Motrin, and visiting an orthopedic specialist would provide stabilization, compression, allow for non-weightbearing on the ankle, and manage swelling. Furthermore, as to the low gallery permit, Kucinsky was in segregation for an average of 22 hours per day. There is no evidence that using the stairs in the limited time he left his cell caused any harm or that a low-gallery permit was necessary to treat the injury. He had crutches to keep weight off his ankles, which can be used on stairs. Further, the nurse practitioner who saw Kucinsky on June 21 also did not provide a low gallery permit at that time, nor did the orthopedic specialist recommend one on June 28. Under the Eighth Amendment, Kucinsky is not entitled to demand specific care, only reasonable measures to meet a substantial risk of serious harm. *See Forbes*, 112 F.3d at 267. Such reasonable measures were taken here.

Kucinsky also asserts that he never actually received an Ace bandage. As with the prescription medication, there is no evidence that Dr. Ahmed knew that Kucinsky did not

receive the Ace bandage. Further, Kucinsky did not complain to the nurse practitioner on June 21 about the lack of Ace bandage. By the time Kucinsky saw Dr. Ahmed again, on June 28, the orthopedic specialist provided Kucinsky with a walking boot, so he no longer needed an Ace bandage.

Finally, Kucinsky contends that Dr. Ahmed made treatment decisions based on administrative and business concerns rather than medical judgment. This argument is likewise unavailing. Kucinsky argues that Dr. Ahmed admitted that he did not prescribe the appropriate treatment (a walking boot) because the healthcare unit did not have them, the orthopedic specialist could provide one later, and because the orthopedic specialist would go out of business if they started providing boots. First, Kucinsky places undue emphasis on Dr. Ahmed's testimony: "we don't want to . . . take a role of orthopedic doctor, otherwise they go out of business." Kucinsky's characterization of this off-handed comment as anything more is not well-taken. Dr. Ahmed's following comment, "I'm just joking" is very relevant to its context. Dr. Ahmed testified that crutches and an Ace bandage are functionally equivalent to a boot, and as such, it is an appropriate treatment for a nondisplaced fracture. There is no evidence that Dr. Ahmed provided an inappropriate substitute for a walking boot, regardless of his rationale for doing so. Moreover, to infer deliberate indifference on the basis of a physician's treatment decision, the decision must be "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Collignon*, 163 F.3d at 987-88 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982)). Such is not the case here, as the treatment for a nondisplaced

fracture is stabilization and no weightbearing, which crutches and a compression wrap achieve.

Importantly, and perhaps most fatal to Kucinsky's claims, the record establishes that Kucinsky's fracture was healing. Three weeks after his x-ray and second appointment with Dr. Ahmed, Kucinsky saw the orthopedic specialist who reported that the right distal fibula fracture was healing, the new x-rays looked good, and Kucinsky's pain was controlled. The orthopedic specialist also provided Kucinsky with an "optional" boot. On the same day as his visit with the specialist, Kucinsky saw Dr. Ahmed for the last time. Dr. Ahmed followed the specialist's plan, provided a permit for the boot, submitted a request for the suggested orthopedic follow-up visit, and reviewed the specialist's instructions with Kucinsky. Just over two months later, a nurse practitioner at the prison, in agreement with the orthopedic specialist, considered Kucinsky's fracture healed.

Based on the record, no reasonable jury could find that Dr. Ahmed intentionally or recklessly disregarded a serious risk to Kucinsky's health. Instead, the evidence demonstrates that Dr. Ahmed followed an appropriate course of treatment for a nondisplaced fracture that largely aligned with treatment provided by the orthopedic specialist. This course of treatment led to noticeable healing of the fracture within three weeks' time. While there is some evidence that Kucinsky did not receive his pain medication in a timely fashion or the Ace bandage, the record provides no link between these delivery issues and Dr. Ahmed, nor does it demonstrate that he ignored a known risk to Kucinsky's health.

Even construing all facts and inferences in favor of Kucinsky, there is no evidence that Dr. Ahmed acted with deliberate indifference in treating Kucinsky's fracture and associated pain. Accordingly, Dr. Ahmed is entitled to summary judgment.

### CONCLUSION

For these reasons, the motion for summary judgment filed by Defendant Dr. Faiyaz Ahmed (Doc. 86) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment and close this case.

**IT IS SO ORDERED.**

**DATED:  September 5, 2024**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**